JUNE 1798.

C. Dorsey
vs.
E. Dorsey.

of pig iron was paid by *C. Dorsey* in his *private capacity*; if it was paid at all, it must have been charged to *general expenses against the company.*

But fault is also found with the exchange being rated at 66 2-3 to reduce it into currency. To this objection I answer, that it is the *legal* exchange, and this court knows no other; besides, have we any proof of the exchange being from 57 1-2 to 65? No. Upon the same principle we might find fault with the price affixed to pig iron, the current price being at this time 10*l.* sterling per ton, and we are only allowed at the rate of 5*l.* sterling.

Upon the whole, I think it must appear evident to the satisfaction of the court, that this decree is equitable and just; that the appellee is only allowed the amount of her claim, according to the value of the property at the time it was converted by *C. Dorsey,* most wrongfully, to his own use; and compensation for the long detention—a detention evidently created by the appellants' themselves, for the sole purpose of *using the property, and enjoying* the profits, for so many years.

*S. Johnston. Key* and *Winchester,* for appellants.

*Martin,* (Attorney General,) *Cooke* and *Ridgely,* for appellee.

THE COURT OF APPEALS *affirmed* the decree of the Court of Chancery, with costs.

———⊙———

## COURT OF APPEALS, JUNE TERM, 1798.

### T. T. SIMMONS *vs.* HILL, *et al.*

APPEAL from a decree of the court of chancery dismissing the bill of complaint.

The bill states, that *Charles Drury,* deceased, being seised and possessed of a considerable real and personal estate, on the 7th of August 1740, duly made and executed his will in writing, whereby, among other things, he devised to his daughter, *Sarah Drury,* and the heirs of her body lawfully begotten forever, all the land which he held between the main road, &c. called *Drury's Adventure,* &c. That soon after, in the same year, the said *Sarah Drury* intermarried with *Abraham Simmons,* by whom she had two children, viz. a daughter named *Betheridge,* and a son named *Abraham,* who was the father of the complainant. That the said *Abraham,* the grandfather of the complainant, died in the year 1745, having first made his will in writing, whereby, with the consent of his wife *Sarah,* (devisee of the said *Charles Drury,*) he devised the land aforesaid to his two children *Betheridge* and,

*Abraham*, and their heirs forever, equally to be divided between them: And in consideration that his said wife had consented to the said devise, the said *Abraham*, by his said will, did devise to his said wife one half of all his personal estate, and constituted her his whole and sole executrix; and appointed trustees to see his said will truly executed. That the said *Sarah* proved the will, and obtained letters testamentary, and returned an inventory of the personal estate, in the year 1746, to the amount of 698*l*. 9*s*. 0*d*, Maryland currency, dollars at 6*s*. each; and about four years afterwards she returned an additional inventory, with *Abel Hill*, with whom she had intermarried, to the amount of 241*l*. 7*s*. 6*d*. like money, making in the whole the sum of 934*l*. 16*s*. 6*d*. like money; one half of which said sum, by the will aforesaid, belonging to the two children of the said *Abraham*, viz. *Betheridge* and *Abraham*. That there was a considerable sum of sterling money due to the said estate, and which was received by the said *Abel Hill*, of which no account appears to have been returned, and he possessed the whole personal estate until the time of his death, which happened in the year 1758. That before his said death, he made his will in writing, by which, after having devised away a considerable estate, all of which he acquired during his marriage aforesaid, he constituted the said *Sarah*, his wife, whole and sole executrix thereof, and directed by his said will, in a particular manner, that the said *Betheridge* and *Abr ham* should be paid without fraud.

That in the year 1760, or thereabouts, *Charles Drury*, surviving trustee under the will of *Abraham Simmons* aforesaid, purchased of the late *Kinsey Johns*, two tracts of land in Anne-Arundel county, called "*Birkhead's Parcel*," and "*Birkhead's Meadows*," containing 600 acres, or thereabouts; and knowing the intention of his said sister, *Sarah Hill*, to provide for her son *Abraham*, he recommended to her to dispose of the land in Prince-George's county, entailed on her and the heirs of her body by the said will of her father *Charles Drury*, and to purchase, with the money arising from the sale thereof, about one half of the land which he had purchased of the said *Kinsey Johns*, the same lying more convenient for her son *Abraham Simmons*, the complainant's father, in lieu of the said land in Prince-George's county, which would have devolved on the said *Abraham* on the death of his mother; and the said *Sarah*, upon consulting with her said brother, who was desirous to see the will of the said *Abraham* carried substantially into effect, did consent to sell the lands in Prince-George's county, and purchase a part of the lands bought as aforesaid by *Charles Drury* of *Kinsey Johns*, for her son, in lieu thereof; and the said *Sarah Hill*, in pursuance of

such her determination, sometime in the year 1761, suffered a common recovery of the said lands in Prince-George's county, and disposed of them, and conveyed the same to *William Bowie*, and agreed with the said *Charles* for the purchase of *"Birkhead's Parcel,"* containing about 300 acres, in Anne-Arundel county, for her said son *Abraham*. The said *Abraham*, father of the complainant, was accordingly put in possession of the same on his arrival to full age, which happened in the year 1765. That the said *Charles* paid the full consideration for the said lands; but the said *Johns* dying before any conveyance was made of the said lands, either to *Charles Drury* who purchased the same, or to the said *Sarah Hill*, or to the said *Abraham* for whom the same were purchased, a bill was filed in this honorable court against the heirs at law of the said *Johns*, to obtain a decree for a conveyance of the said lands, and a decree was obtained, but no deed was executed in the lifetime of the said *Sarah* or *Abraham*, the said *Sarah* conceiving that nothing more was necessary after a decree was obtained. That the said *Sarah*, intending and considering that the said land called *"Birkhead's Parcel"* as her son *Abraham's* property, and the said *Abraham* believing it to be his own, made sundry valuable improvements thereon, and lived on it, using it as his own, until the time of his death, which took place in the year 1782. That in the year 1777 a further agreement took place between the said *Sarah* and the said *Abraham*, that in consideration of the latter's releasing to the former, all his part of his father's personal estate, &c. she would devise the said last mentioned tract to the said *Abraham*; and she did, by her will, devise the same land to the said *Abraham* and his heirs, by the name of *"Birkhead's Meadow,"* and *"Birkhead's Parcel,"* containing about 300 acres; and the said Abraham executed such release accordingly—both the will and agreement were dated the 7th of May, 1777. That the said will was placed in the hands of the Reverend *Walter Magowan*, who was consulted, and who drew the said will and agreement, and who kept the same until after the death of the said *Abraham*; but what has become of the said will is unknown to the complainant. That the said *Sarah* and *Walter Magowan*, are both dead, and that since the death of the said *Sarah* an instrument of writing has been exhibited to the orphans court of Anne-Arundel, purporting to be the last will and testament of the said *Sarah*, but which is not the last will and testament of the said *Sarah*, in execution of the agreement aforesaid. That the said *Sarah* was an unlettered woman, and the said will obtained by fraud, and the same ought to be decreed null and void by this court, for the reasons before sta-

ted. By the said last mentioned will, the said land is
devised to *Susanna Hill* and *Sarah Hill*, two of the
daughters of the first mentioned *Sarah*. That the said
*Johns* has been prevailed on to convey the said land to the
said *Susanna* and *Sarah*, who brought an action of eject-
ment, and recovered judgment for possession, &c. *Prayer*
for an injunction against the judgment, &c. and for gen-
eral relief.

The *answers* deny every material fact alleged in the bill.
—A commission issued and testimony taken and returned.

HANSON, Chancellor, (December term, 1795.) Hav-
ing heard the arguments of counsel, observes in his decree,
that "the first thing which forcibly strikes his mind is
this—The complainant, praying the benefit of a contract
or transactions between *Sarah Hill* and *Abraham Sim-
mons*, does not state that he is either *heir* or *devisee*.
The defect of the bill is not supplied by the answers; nor
does it even from the testimony appear that he is either
*heir* or *devisee* of the said *Abraham*, under whom he ap-
plies for relief. That the said *Abraham* had an equita-
ble claim to the lands in question, arising from the will
of his father *Abraham*, and the conduct of his mother
relative to that will, is a point relinquished with much
candour and propriety on the part of the complainant.

Supposing then the bill amended, &c. and the complain-
ant heir at law of *Abraham*, who died intestate; supposing
then a fair, honest agreement, made through *Magowan's*
agency, between *Abraham*, and *Sarah Hill* his mother, in
consequence of which *he* released all claim to his father's
personal estate, and she executed a will, attested as it ought
to be, devising unto him *and his heirs;* suppose that will
not to have been cancelled, destroyed or revoked, by the
testatrix; inasmuch as the devisee died before the testa-
trix, nothing could pass by that will to his heir; the de-
vise was absolutely void, and it was necessary for Mrs.
*Hill*, if she did not chuse to die intestate as to the land,
to execute another will. When an agreement is fairly
made, and every article of it performed, what more is in-
cumbent on either party? To give effect to what *ought*
to be construed the intent. If the full execution of a
contract, *according to its letter*, does not operate so as to
give every advantage which might in case of subsequent
events proving different have been derived to one of the
parties, is this court to direct the other to do that which
ought in prudence or justice to have been stipulated?
Is it to construe the will to have been not only an irr vo-
cable instrument, but an agreement, that in case *Abraham*
should not be the longest liver, his mother should con-
trive that *his* heirs or devisees, after his death, should

have a fee in the land; if so, the will amounted to an agree-ment to make just so many wills as circumstances should require as for a deed, to settle the land according to the spirit of the contract. It will scarcely be contended, that if after the execution of the will, and release in conse-quence of the agreement, *Abraham* had filed a bill for re-lief, he might have obtained a decree obliging her to con-vey. The depositions taken on the complainant's part, tend to prove, that she actually persisted in a refusal to settle the land by deed. There is no direct testimony re-specting the agreement which is said to have been brought about by Mr. *Magowan*, and to have produced the will and release. Let his declarations be taken for evidence, and they do not prove the intention of the parties to go beyond this—" Mrs. *Hill* shall execute a will devising the land " to *Abraham* and his heirs: in consideration thereof, " *Abraham* shall execute a release of his claim to his part " of his father's personal estate; both instruments shall " be delivered to Mr. *Magowan*; if Mrs. *Hill* shall die " without revoking her will, and it shall take effect, the " release shall be delivered to her representative. The " difference between a mother and her son will thus be " properly adjusted."

This is certainly the most rational idea to be formed from the testimony, and the conduct of the parties has no small tendency to confirm it. The will was given up to the testatrix when it could not possibly avail; and the release was delivered to *Abraham's* representative.

Dismissing then all supposed equity arising on the will of old *Abraham*, or on the will of Mrs. *Hill*, and the re-lease of her son *Abraham*, it remains only to inquire, whether, at any time, Mrs. *Hill* made such a contract for vesting in her said son a title to the land as this court ought to carry substantially into effect?

No writing, which contained such a contract, has been either produced or alleged. She desired, it seems, certain persons to bear witness that the land was purchased for her son. She certainly did not by *that alone* bind herself to convey. But it is said that she entered into a verbal agreement with her brother, who undertook for *Abraham,* (then a minor,) to give him the land in consideration of his relinquishing the claim aforesaid; that she having giv-en him possession of the land, which he used and improved, as his own, until his death, and he having executed a re-lease, there can be no doubt that the case is that of an agreement by parol, which this court ought to execute.

The great object of the act to prevent frauds and per-juries, was to provide that agreements be made with deliberation to prevent misconception of agreements; and to prevent men from setting up agreements which never

had been made. It is admitted, that when a fair, honest, verbal agreement, for the sale of land, is alleged in the bill, and admitted in the answer, or when it appears clearly that such an agreement has been made, and has been performed on one part, or something has been done in pursuance of it, this court will decree a conveyance immediately, or on the proper terms.

But what is the present case? Suppose even a parol agreement established between *Mrs. Hill*, and her brother acting for her son; that such an agreement was binding on her, although certainly not binding on her son, or on her brother. Is it proved that she agreed to convey a fee to her son? Is it clearly proved that she put him into exclusive possession of the whole land, or that he ever effectually relinquished his claim to his part of his father's personal estate? That he did sign a release, which was not delivered to *Mrs. Hill*, but to *Mr. Magowan*, is indeed sufficiently proved by the testimony, which proves also that it was done in consideration of her executing a will, and not in pursuance of a former agreement. Are all transactions to be considered together, and one certain, *honest, fair agreement,* to be collected from the whole? By no means. The inference to be drawn from the whole is this—that such an agreement was often in contemplation, but never actually concluded, otherwise than was done through *Magowan's* agency.

The stronger an impression can be made in favour of this man's character, the stronger must be the ground for belief, that an *effectual* agreement was never made, and that *Mrs. Hill* pertinaciously resisted all solicitations or attempts to part with her controul, or to give (as is the favourite phrase of persons in her situation,) the staff out of her own hands. A man of integrity, judgment and skill, called upon to exercise that judgment and skill in preparing effectual writings, would never think of a will revocable in its nature, on one side, and a release not to be immediately delivered on the other.

And now, let a supposition be made, the most favourable for the complainant which the testimony can possibly authorise—suppose an agreement binding on *Mrs. Hill* to vest a fee simple in her son, in consideration of his releasing his claim to his father's estate; suppose, that in consequence of this agreement, she gave him full possession, which he retains till his death, having made valuable and lasting improvements; her devisees are now called upon to complete the performance of this agreement by a conveyance. Shall this court give all the benefit of a contract to one party, without securing the consideration stipulated for by the other party? Does it appear that *Abraham* effectually relinquished his claim? Can the court *in this cause* direct such a release, or decree such an injunction as will

prevent a recovery of the personal estate (if any there be due,) to *Abraham's* representatives, from the representatives of Mrs. *Hill?* It surely cannot direct a release by, or enjoin persons who are not parties to the suit. And it does not appear from the papers, nor is it probably the fact, that the complainant is the sole representative on whom the personal rights and claims of his father have devolved. A slight consideration may support an agreement made by a parent with a child; but the consideration, however slight, must be performed.

The defendants are indeed *volunteers;* they have paid no consideration for the land; but they each had a natural claim on Mrs. *Hill,* equal to that of their brother *Abraham;* and this court ought unquestionably to be clearly satisfied that there was a fair, honest agreement, and that Mrs. *Hill* had, or her representatives may have, all the benefit contracted for on her part, before it will undertake, on account of that agreement, to divest the defendants of their legal title under her will. Perhaps indeed, no instance can be produced of this court's divesting a legal estate where the facts, on which the equity arose, had been strongly litigated, until those facts were established by the verdict of a jury. Can a case be produced of an issue directed by chancery to try whether or not a parol agreement had been made? And shall then, (it may be asked,) shall this court neither decide itself, relative to a strongly litigated fact, nor send an issue to be tried by a jury? Yes! If an alleged agreement be so difficult of proof, and be so extremely questionable as to its nature and extent, it wants one essential ingredient; it wants that certainty, which would result from a writing, as directed, or required by the statute. And this court, although it endeavours, so far as it safely may, to prevent an injurious harsh operation of the statute, which would be contrary to the intention of its makers, will never destroy that safeguard which the legislature has provided for the protection of property, and the prevention of fraud and imposition. It may be proper to remark, that it is not merely because an agreement is positively denied by the answer that it is called a fact strongly litigated, it is because not only it is denied, but the evidence leaves it quite uncertain whether or not the agreement was made, and (if made,) what was its nature and extent,

How often is it necessary to repeat, that when a contract is established, even by admission, it is still a matter of sound discretion whether or not, under all circumstances, a performance shall be decreed.

That *Abraham Simmons* was harshly and capriciously treated by his mother, is extremely probable; but a simi-

lar treatment is often the lot of meritorious children, whom this court has no power to protect.

Upon all the circumstances of the case, it is, this 25th of January, 1796, adjudged, &c. that the injunction heretofore issued in this cause be dissolved; that the bill of the complainant be dismissed, &c.

The complainant appealed to the court of appeals.

*Mason, Shaaff* and *Wilmer,* for the appellant.

*Martin,* (Attorney-General,) *Cooke* and *Key,* for the appellees.

It was agreed and admitted in the court of appeals, by the counsel for the parties in the case, "that *Thomas T. Simmons,* the appellant in this cause, is the eldest son and heir at law of *Abraham Simmons* in the bill and answer named, which *Abraham* was the eldest son and heir at law of *Abraham Simmons* the elder, and *Sarah* his wife, formerly *Sarah Drury,* and after the death of her first husband, *Abraham Simmons,* was *Sarah Hill,* the wife of *Abel Hill,* as stated in the said bill and answer. And that in the determination of this cause, the above facts shall be taken and considered as if the same were stated and admitted in the original bill and answer in this cause filed."

*Shaaff,* for the appellant. The present case, to prevent confusion, will be considered most properly under two propositions:

*First*—That *Sarah Hill* did contract to convey to her son, *Abraham Simmons,* the land called *Birkhead's Parcel,* bought by her of *Charles Drury,* and put him in possession.

*Second*—That the contract proved, is such as the court of chancery will decree the specific performance of.

The evidence applies to two transactions, one before the making of the will in 1777 by *Sarah Hill,* the other to the will in 1777. I will consider the case in that order.

It must be remembered, that *Abraham Simmons* was issue in tail to the lands in Prince-George's county, devised in tail to his mother *Sarah,* by her husband *Charles Drury,* and consequently presumable, that if she sold these lands she would buy others for him; this she did of *Charles Drury* her brother.

He read sundry depositions taken in the cause, proving *Sarah Hill's* intention, before she bought the land; and he also read sundry other depositions proving that she did actually buy the land for her son *Abraham Simmons.* And he contended, that the depositions positively proved the contract from the best evidence, viz. the declarations of Mrs. *Hill* herself, from whom both the parties in this

cause derive their claim; and one witness, *(John Weems,)* proved the very contract on behalf of *Abraham Simmons,* at the time it was made, in the most solemn manner, by calling persons to bear witness—that he was present when Mrs. *Hill* agreed with *Charles Drury,* on behalf of *Abraham Simmons,* to convey the land to *Abraham Simmons.* But this is put beyond all doubt by the possession of *Abraham Simmons,* and the continuance of it to this time from as far back at least as the year 1767.

He read sundry depositions proving *Abraham Simmons's* possession of the land from 1767, until his death; and that he built houses, and made improvements.

He contended, that this evidence in the fullest manner clearly proved two things, viz. that there was a contract between the mother and her son, and a possession under that contract; which alone gives a substantial ground of relief in equity. But that the transaction which took place on the 7th of May, 1777, ought alone to give the appellant a ground of relief. Independent of *Magowan's* declarations, it is sufficiently proved, that in consideration of the release of the personal estate, Mrs. *Hill* agreed to devise the land in question. The release is still in existence, and the evidence of the release is very powerful.

He read sundry depositions relative to the agreement, the release, and the will; and contended that the evidence proved the agreement and will; and that, if the declarations of Mr. *Magowan* were taken as evidence, the thing was conclusive.

He contended that all evidence set down in a court of equity, and not excepted to, is regularly evidence; that if the party had any objections the way would be to expunge on exception; as no exception has been taken, none can now be made.—7 *Ca. Parl.* 306 *or* 206. But he contended that the declarations of Mr. *Magowan* were evidence—3 *Burr.* 1244.

Taking the different contracts to be proved, it will then be necessary to establish, that a court of chancery will enforce the performance of it. This leads to the

*Second question.* That the contract is such as a court of chancery will execute.

In courts of law and equity there are two kinds of considerations—a *good* consideration, and a *valuable* one—either will be sufficient to enable the court of chancery to decree. If it be merely voluntary, and to a stranger, the court of chancery will not interpose. Considerations of blood is sufficient to raise an use—2 *Black. Com.* 338. A court of chancery will decree a performance of a voluntary contract, when made for a provision for a child.—2 *Com. Dig.* 126. A voluntary settlement

shall be decreed to one co-heir against another, even where it is afterwards devised to both. 2. *Com. Dig.* 122. The cases in which these principles most frequently occur, are where the court of chancery aids the defects of conveyances, and it must be easily discovered that every instance of that kind must be a case in point, when it applies to volunteers, because the conveyance being void, the court of chancery enforces the agreement which has never been complied with. Conveyances voluntary shall be supplied in favour of children—1 *Vern.* 40. 2 *Vent.* 365. 2 *Com. Dig.* 172. A defective voluntary conveyance to a brother of the half blood was aided—1 *P. Wms.* 60. A court of equity will supply in favour of younger children.—1 *Fonb. Eq.* 341. 1 *Vern.* 132. 1 *Salk.* 187. The same principle is established and recognized in 1 *Fonb. Eq.* 34. 1 *Loft's. Evid.* 140. 1 *Vez.* 220. 2 *Vez.* 164, 582. 1 *Atk.* 137.

But this is not voluntary, because the personal estate, 638*l.* 14*s.* 3*d.* is to go in payment. The cases cited clearly establish the point, that independent of the will of 1777, the court of chancery has full power to decree a performance. But the transaction which then took place will put it out of all doubt. A court of equity considers the nature of the contract of the parties, and will decree according to the substance of it—1 *Fonb. Eq.* 34. In the present case there can be no doubt but it was the design to give the land; the engagement was, that an effectual devise, *i. e.* a devise by which *Abraham Simmons* should take the beneficial interest, not simply that she should execute a will and afterwards revoke it. The situation of *Mrs. Hill* explains it; she had previously engaged to let *Abraham Simmons* have the land; she was ill, and expected to die; a will was suggested by *Mr. Magowan*, which if she had died would have been effectual, but she survived and vacated it. There have been decisions on this point—If a man contracts with an heir at law, claiming to leave him 500*l.* or his land, if he dies without issue, this contract will be executed—1 *Vern.* 48. Inequality of price is no objection to a contract—*Ca. Cha.* 4. 2 *Vern.* 423. 1 *P. Wms.* 542. 2 *Com. Dig.* 125. *Ca. Cha.* 159. 2 *Com. Dig.* 122. 2 *Powell*, 152. *Ca. Temp. Tal.* 239. This case is out of the statute of frauds by the delivery of possession—1 *Fonb. Eq.* 171. Taking possession and making repairs—payment of money—taking possession—will take a parol contract out of the statute.—1 *Powell Cont.* 296 *to* 300. It is here stated, although there is a variety of evidence concerning the contract, yet if one be made out satisfactorily it will be decreed, although by parol. This is an answer to part of the chancellor's decree. There can be no objection on account of *Simmon's* repre-

sentatives being parties, because the contract was complete on the part of *Abraham Simmons* by the release.

*Mason,* on the same side. The case may be considered in two points of view.

*First,* as a voluntary promise to convey lands under such circumstances as to make it proper to enforce a fulfilment thereof.

*Secondly,* as a contract upon a valuable consideration fairly entered into, performed on the part of the appellant's father, and such as ought to be specifically decreed.

As to the *first question* under consideration, and here it will be necessary to consider the situation of *Mrs. Hill,* the mother, and that of her son *Abraham Simmons,* the father of the appellant.

The answers of the appellees admit, that in 1758 *Mrs. Hill* was a widow, having buried two husbands; by the first she had two children, *Betheridge* and *Abraham Simmons;* by the last five who were living. *Abraham Simmons* her eldest son, was then 14 years of age. By her first husband she had received in marriage a competent fortune. By *Hill,* her last husband, she gained no acquisition to her estate. *Hill,* however, had by his industry, and by the possession of her maiden lands, and the use of her first husband's estate, made provision for his children by her.

Her first husband, from a mistaken confidence in her, or from some misconception of his own powers, had devised a part of her maiden lands to his son; he had made a beneficial devise to his wife of one half of his personal estate. His mistake as to his power over his wife's land most probably produced this devise to his wife of the personal estate. Her son *Abraham,* was the heir in tail, the person intended by her father to inherit the Prince-George's land. Had the entail not been defeated he must have inherited. She seems to have considered the land his, and at his request, and that of her brother, she barred the entail for the purpose of making a more advantageous provision for the heir in tail. Under these circumstances she makes an agreement with her brother, and calls persons to witness it, that this land should be her son's. When he arrives at age, or before, she puts him in possession of it, and under a belief that it was his, which she never contradicted, he makes lasting and expensive improvements thereon. This statement is proved by the testimony of a number of respectable witnesses who were examined in the cause.

In this point of view the agreement, though wholly voluntary on the part of the mother, ought to be enforced, because it is between a mother and her son; because by

it the son was led into expenses he otherwise would not have incurred; because if the entailed land had not been disposed of in the mother's life, it would of course have descended to this son, and most likely never would have been disposed of but at the instance of her son and brother.

Generally a voluntary agreement will not be enforced by a court of chancery; but if it be for the provision of a child or children, it shall be decreed—2 *Com. Dig.* (96) 126 (2 *C. 7.*)  Although generally a defect in a voluntary conveyance shall not be aided in chancery, yet if it be a provision by settlement for children it shall—1 *Vern.* 40.   A voluntary settlement upon one daughter, inoperative in law, shall be decreed against the other daughter and co-heir, though the father had devised the estate to them both—2 *Com. Dig.* (93) 122, cites 1 *Cha. Rep.* 157. A. who had only a possibility in case his elder brother died without issue, agreed to settle lands after his decease, (if they descended to him,) upon a relation, who married without his father's consent, to the intent that his father might be reconciled to him—agreement decreed—2 *Com. Dig.* (93,) 122; cites 1 *Cha. Ca.* 159   Here was no consideration—It was perfectly voluntary, but it was meritorious as between relations.

This case is not within the *statute of frauds and perjuries*, because in part executed by giving possession, and because of the improvements thereon made by *Abraham Simmons*—1 *Vern.* 156.

As to the *second question,* a contract upon valuable consideration performed on the part of the son *Abraham Simmons.*

Mrs. *Hill,* and her son *Abraham,* both stated a firm contract, that the proportion of old *Abraham Simmons's* personal estate, which belonged to the son *Abraham,* should go for and be taken as the purchase money of this land. The witnesses prove it, and the Rev. Mr. *Magowan* declared the same things to sundry persons.   The consideration was 638l. 14s. 3d. current money.

This agreement made absolutely, not conditionally, for the disposition of this land.

The release is not an *escrow,* but an absolute release put into the hands of Mr. *Magowan* for safe keeping, at the instance of both parties.   This is proved by a number of witnesses.

The substitution of a will, instead of a conveyance, is no part of the contract; it was resorted to from the circumstances of Mrs. *Hill,* and a confidence on the part of her son that she would not revoke it.

Where an agreement is fairly made, and fully executed on one part, and imperfectly, or not at all on the other, it will be enforced.

*Key,* contra *(a.)* It is admitted, that the parties in this cause are respectively volunteers; but let it be further observed, that the defendants have an equal equity, and have the legal title to, and are seised in fee of, the land now in controversy, and have obtained a judgment therefor in an action of ejectment in the general court.

It is considered by the complainant's counsel in two points of view.

*The first* is, whether the will of *Abraham Simmons,* coupled with the widow's acceptance under it, and with her other acts and declarations prior to 1777, will not entitle the complainant to relief. We apprehend most clearly not. The case is simply this; Mrs. *Simmons* was seised of an estate in tail in certain lands; her husband made his will, devised his wife's land to his *two children,* and gave his wife one half of his *personal estate;* he had no real estate of his own. The widow stood to the will—and does her acceptance of a moiety of her husband's *personal* estate, under his will, oust her of her own fee tail lands, because in the same will the husband had devised them?

A widow is entitled by law to dower in the real estate, and thirds of the personal estate of her deceased husband; and this arises by operation of law, independent of the husband's bounty or controul; and every thing that he devised by will to his wife, of either real or personal estate, was considered in law as *cumulative;* which was a natural and reasonable construction arising out of their connexion as man and wife. This continued to be the law until 1715, when the legislature, in cases of devises of real or personal estate to a wife, drove her to make her election to claim under the will, or take the estate the law gave her. But she *yet retains* an election as to *both real* and *personal* estate. Thus, if a husband seised of an estate of inheritance, devises the same to his two sons, and devises a moiety of his *personal* estate to his wife, her standing to the will, or in other words her acceptance of the devise, does not so affirm the devise of the lands in the same will to the sons as to preclude her of *dower therein,* but she is entitled to her dower estate by title or operation of law. Is it possible then to conceive, that if the husband devises *her* lands to *his* children, and one half of his personal estate to her, that her acceptance of the devise of the personal estate, loses her right to her own lands? Is she not (in this case,) seised of her own lands in fee-tail by her father's will, and is not that title as good as her dower right in the other case? Both arise by operation of law, and are equally available, and in neither case can her acceptance of the devise of the *personal estate,* bar her inte-

*(a)* This argument was made by Mr. *Key* before the chancellor.

*rest in the real*, unless the devise is made *expressly* on such condition.

But it is contended, that whoever takes a benefit under a will must affirm that will *in toto;* and that in this case the wife's acceptance of the devise of the *personal* estate binds her to affirm the will as to the *real*, although it was her *own property*, and the testator had *no interest* in it.

I admit the law in those cases, where a father seised of estates tail, and *fee simple estates*, about to *provide for his children*, devises the entailed lands to his younger son, and the fee simple to his eldest, that the latter shall not claim both. The reason is found in the cases, 2 *Vern.* 581. *Powell*, 445, 446. *Ca. Temp. Talb.* 176. 2 *Vern.* 233. 2 *Com. Dig.* 186. All these cases recognize the principle of *Noye & Morduant*, which was the first case; but these cases all relate to devises of *real* estate only, and I conceive are not applicable to a devise of *personal estate*, as being conclusive on the party taking, to affirm the will *in toto* as to the *real.* The case in 2 *Ves.* 12, was *that of a devise of personal legacy to an heir, but upon express condition that he should not dispute or controvert the will.* It is obvious that the heir could not claim both, in the teeth of the condition; no legatee can claim a legacy by violating the condition on which it is expressly given; the party in this case, put to their election. 2 *Ves.* 617, turned on this point, whether the legacy was to be a satisfaction for a debt due to the legatee or not, the testator having miscalculated the debt—this was a case *altogether of personal* and not *real estate.* 2 *Vern.* 555, was the case of *articles before marriage*, and a subsequent devise. It was determined on this point, that although the will did not mention the legacy to be in lieu of what was given by the articles, *yet the will imports a disposition of the whole estate;* what was intended for the wife, and what for children. In this case the testator had made a disposition of his whole estate; if the articles were to take effect they violated that disposition; for if *all* was disposed of, *nothing was left to satisfy the articles;* therefore the party could not claim both. It is apprehended no case of articles *previous* to marriage and *devise subsequent*, can be analogous to this case, where the wife, independent of all articles and contracts, was seised of an estate tail in her own right, and where, by no possibility of construction, the devise of one half of the personal estate could be considered as a satisfaction of her thirds, and legal estate of inheritance in her maiden lands.

We meet no case like it; and we trust it will never be put in the power of a husband to devise away his wife's

maiden estate, by giving her in the same will a guinea or an hundred pounds of *personal property* more than her thirds. Nay, if the principle applies, one farthing devised to her over and above what her distributory share would amount to, would rob her of her whole maiden estate in lands.

The testator's will does not in any degree imply that *he* would have given his children *more* of the personal estate, and the wife *less* of it, had he not have supposed she would have carried into effect his disposition of the real estate. I admit the act of 1715 will not let the widow have both the legacy and her thirds of the personal estate; but I verily believe, 99 times in the 100, it defeated the intention of the testator, whose gratitude and affection would make him give her a legacy to express his regard, as a bounty in addition to what the law allowed.

In this case he divided his personal estate between his wife and children. And is the surplus between her thirds thereof, and the moiety devised, supposed, or can it be supposed, as a fair consideration for her maiden estate, and constitute her in equity a trustee for the children? I never can so believe. It was never so contemplated, or *other parties* would have been made to the bill, because the testator's devise of the wife's lands, being a *tenancy in common* to his *two children*, the daughter, or her issue, should have been joined. Under what pretext does one tenant in common file the bill, except as to the second point raised in this case?

If the parties were now living, and a bill had been filed against the wife, if the complainants' doctrine is right, the utmost the court would do would be *to put the* wife to *her election* either to reject her devise, and take what the law allows, or to accept it under the terms of letting the land go to the devises *immediately*. If such consequences were or had been explained, can any one doubt what would have been her determination. She never had an idea of such law, nor had the parties interested. She would have been at once deprived of her whole real estate, and left to subsist on between 4 and 500*l.* of personal property. Suppose the devise had been *less than* her thirds of the personal property, her accepting the devise could only have been a bar of right as to the *personal*; if more it is always in the case of a wife, considered as accumulative, or a bounty, and there is no instance to show in such case that the court ever thought she was barred by any such devise of her interest in the *real estate* of her husband, and much less in her own property. The case in 3 *Atk.* 715, is not half so strong a case as this, and yet she held both.

As to the *second point*, whether the whole of the circumstances in this case constitute a sufficient consideration to raise and support a contract which equity will enforce.

The case cited from 2 *Vern.* 233, is where a father settles land on his son in tail, and takes *bond* from him not to dock it. The bond was held good. The reason is obvious; the bond was an inducement for the father to make the settlement in tail, if it had not been given the father might have only given a life estate, or no estate at all; to set aside the bond would have been a fraudulent act on the part of the son, who gave it as *an inducement* to obtain such an interest in the land.

But what act in this cause has been done by Mrs. *Hill* in any degree analogous to that of the son in the case in *Vernon*, 233, who to get the interest in the land gave his bond?

2. *Com. Dig.* 126—An agreement, *founded on mistake* between brothers, on a devise in their father's will, decreed. In that case an agreement was made, and executed between the brothers. In our case it is *denied that any agreement* ever took effect, or was *entered into* by the mother to *carry her husband's will into execution.* I contend, that if the mother ever agreed to carry her husband's will, as to the real estate, into effect, such agreement must have been to the benefit of *both the devisees*, and not *the son only*, and there is not an atom of proof in this cause that the mother ever agreed to carry it into effect for the benefit of the daughter, the tenant in common under the will; but the complainant asserts the contrary. Then it necessarily follows, her agreement (if any,) was not to carry the *will into effect*, but to carry into effect some *particular* agreement with the son, independent of the will of the father, and in opposition to it. Therefore the cases cited do not apply, because an agreement to carry the will *into effect, for the benefit of the son only*, never could exist, it being directly contrary to the words and intention of the will, which is a devise to the son and daughter equally. But it is said a valuable consideration passed from the father's estate to the mother. The devise gave her 467*l*. 8*s*. 3*d*. of personal estate, instead of 311*l*. 12*s*. 2*d*. the amount of her thirds. So the difference 189*l*. 15*s*. 1 1-4*d*. instead of being considered as a bounty to the wife, (and which she stood to, without prejudice to her real estate, and was authorised by law so to do,) is upon principles of equity set up as a consideration to rob the wife of her maiden lands. From whom does this consideration pass? From her husband, it is said. With what view? Why that she may carry his will into effect *for the equal benefit of both devisees of the*

*land.* The consideration passed as well from the *daugh-ter as the son,* because her personal estate was diminish-ed by the devise to the mother, as much as the brother's; then she is equally interested in every point of view with the brother. And *yet this court is called upon to say she made an agreement to carry the will into effect for the be-nefit of her son only.*

This court would scarcely credit even *proof* of an agreement, and certainly will not *presume,* that the mo-ther meant by any act of hers to evidence an intention, or to make any contract relative to carrying that will into effect, which in its very outset violates the will it meant to support, by giving to the son what the daugh-ter was equally entitled to, whose name is never heard of in this suit, and whose interest is deserted. When Mrs. *Hill,* after her first husband's death, barred the en-tail of her maiden lands, and purchased the land in con-troversy, it is said this was done for the benefit of her son. This is hearsay, and not evidence; but if it was, it plainly shows that she did not mean to carry the hus-band's will into effect, or she would have purchased for the *joint* benefit of both son and daughter. Again, it is said that the son sacrificed his part of his father's per-sonal estate to his mother, and this is a sufficient consi-deration to raise a contract. Here then arises a *new* con-sideration, *independent of the father's will and devise to his wife.* The *sister's* interest and the *father's will,* are both deserted; and a new substantive ground of equity is taken. How far that was given up, his wife's con-duct will show, who after *Abraham's* death sued the mo-ther's administrator to recover that very sum, which it is now said was given up many years before as the con-sideration for the land.

It is said that *John Weems* (one of the witnesses,) has proved the mother's agreement in the most solemn man-ner to give the land in Anne-Arundel county to her son, in lieu of her Prince-George's estate, and that she pur-chased the Anne-Arundel lands with the money arising from the sale of the Prince-George's land. Most proba-bly she often said so, and intended to give it to him, and probably would if she had liked his conduct through life. But if the expressions of a parent's intention, in favour of a child, are to be drawn into agreements and contracts for this court to operate on, a few cases of that kind seal the lips of most parents with respect to their property and their children. It is further said, that letting him take possession at 21. is carrying the agreement into ef-fect, and takes it out of the statute of frauds. The agree-ment or conversation did not *pass to,* and was not made *with Abraham;* it was conversation of her intentions

with *a third person.* Where exists the proof that she put her son in possession to carry *her contract* made with such third person into effect? The most probable and fair construction of this act is, that she let him live there as a temporary home; at best letting him live there was an equivocal act, and ought not to be construed to wrest the estate out of the devisees, now seised of the legal title. By a supposed contract he was to have it after her death, by a will made in his favour; then this living on the lands in her *life-time,* could not be a part execution of a contract which was to take effect *after* her death. Again, it is said, independent of the contract, the facts create a *plain trust;* it is said she sold the Prince-George's lands, "and bought the Anne-Arundel lands *expressly for her son,* although purchased in her own name; that she bought it with the money arising from the entailed land t which she supposed her son had a title under her husbar d's will." To this it may be again replied, that she could not mean any such thing in the purchase of the Anne-Arundel lands, as she would have bought them for the *joint benefit of the son and daughter,* which she did *not* do. Her declarations to *Charles Drury,* and her purchase, are repugnant to the will; for it was not carrying the *will into effect* to buy the Anne-Arundel lands *for her son,* with the proceeds of the entailed lands in Prince-George's county. She simply conceived that her right to her maiden lands st ll existed; she sold them, and purchased in Anne-Arundel, to be near her brother, and for greater convenience, and most probably contemplated and said she would give them to her son, but never so agreed or contracted on such a valuable consideration as to prevent a future disposition of them to whom she liked best.

But the facts and contract in 1777 are sufficient to entitle the complainant to a decree. If they are, then there is an end of the *first point about the will;* because under that the daughter is equally entitled, *but it not being convenient to let her in,* this new point is discovered. If *the first point is a good one,* this second supposed contract *with the son* was a fraud in both of them against the daughter's interest under her father's will. It is a hard case, which must support itself upon such inconsistent principles. In one part of the case, to wit, the first point, you must construe every act done by the mother as evidencing her intention to give validity to the husband's will, which was in favour of both *son and daughter,* though *he* only claims. In this latter point, all her acts must be construed to make or imply a contract to the exclusive benefit of the son, and to the fraud of the daughter's right under the father's will, and thus set the latter part

of her life in opposition to all her former conduct and in-
tention of carrying the will into effect; this last measure
being evidently calculated to defeat the will of her hus-
band.

That any contract or agreement was entered into be-
tween *Abraham Simmons* and his mother, that she was to
leave him, by will, her land, and he to release his claim
to his father's personal estate, cannot be admitted to be
proved in this case by any *legal and competent* testimony.
*Hearsay* and conjecture is not sufficient; and the counsel
for the complainant, in one part of their argument, has
thrown out part of their case as being supported on *hear-
say only.* It is said on this part of the case, that the
agreement in 1777 was simply to leave the son the land
in Anne-Arundel county by will, instead of the land in
Prince-George's county, and this agreement was execu-
ted by making a will to that effect. The complainant
still proceeds on the ground that the will of the father
was intended to be carried into effect by the will of 1777.
It has often been said that this never could have been the
idea, because giving the land to *the son only,* was not car-
rying the father's will into effect, which equally gave the
property to the daughter; and this mistaken impression
seems to have influenced the whole argument. That Mrs.
*Hill,* the mother, made a will in the son's favour, I can
believe, but that the foundation of this will was a *contract*
for the consideration of which the son was to release his
interest, I cannot believe.

1. The son's widow sued the mother's administrator,
to recover what was due to him, after the death of both
parties, and no claim made to the real estate until that
suit was defeated.

2. Because it is at one time contended, that the mother
was *in all her acts and conduct* governed by the principle
of carrying her husband's disposition of her estate into
effect, although every act and expression of hers is alleged
to be in favour of the *son only,* in violation of the will,
which gave the daughter an equal interest.

3. Because the release is not proved to have been exe-
cuted with the privity and approbation of the mother *as
the consideration* of her making the will, and was never
delivered to her. Such a paper would require the most
explicit and unequivocal proof, because it tends to make
a *will a contract,* and as such, *irrevocable.* Why not
give a paper binding herself to convey the land to her son
in consideration of the release? This would have been
more simple, and freer from doubt than a will. And
why should the old lady, had she made this contract,
have rescinded it, and made another disposition of the
estate so immediately after, and without any subsequent
cause for her conduct?

The case in 1 *Vern.* 48, goes upon a compromise to quiet the claim and right. But what right or claim had the complainant in this case independent of the daughter? He had none. Is it proved he alleged one, and therefore prevailed on his mother to make the will? When or where is it proved that he made any, and what claim against his mother for this land? If it is not proved, the case is not analogous; and it will not be contended his part of the personal estate was an adequate consideration for the land.

I conceive *hearsay* is not evidence in this cause to defeat the legal estate of the defendants; see *Buller* 294; *Esp.* 785; and if *hearsay* is not admitted as competent and legal evidence of a fact, the complainant has proved nothing. The chancellor will determine its admissibility, and examine then what legal proof exists in the cause.

Two witnesses to the release, neither of them knows where it was executed, nor in whose custody it has been; none of them pretend to say it was executed in the presence of the mother, with her consent and knowledge of its contents, as a consideration for her will. This ought to be most clearly proved; but not an intimation exists, except *from hearsay*. It is not known when or by whom it was delivered to Mr. *Magowan*, nor upon what conditions; and its being returned to *Simmons*, or his wife, is *prima facie* evidence that it was a conditional contract, (if any,) and considered as no longer binding. If the contract was an absolute unconditional one, why not leave the release in the possession of the mother? But the placing it into the hands of Mr. *Magowan*, if with her knowledge, shows it was to take effect only upon the event of her not altering her will and her leaving the land to her son, in the nature of an *escrow*. No case can be found to justify the court in carrying into effect *such* an agreement, proved in such vague and uncertain terms; the agreement itself not reduced to writing; the consideration so inadequate; the testimony, such as it is, only hearsay evidence of what she intended to do, and not what she had done, and contradicted by her open and avowed conduct afterwards. The agreement, to be decreed in equity, ought to appear certain, plain and fair, in all respects, and not conditional—3 *Atk.* 383.

*Cooke* for the appellees. The difficulty of arguing this case, arises from the change of counsel on the part of the appellant. There have been three sets of counsel, Mr. *Duvall*, Mr. *Pinkney*, and those who now appear. At first it was relied on that Mrs. *Simmons* agreed to let her husband devise her land; this is now abandoned, because not proved. It was afterwards contended, that if she

JUNE 1798.

Simmons
vs.
Hill.

took by the devise of her husband she must be bound by the will; this has been given up. And it was also contended, that the land in Prince-George's was sold, and the land in Anne-Arundel bought with the proceeds, which made Mrs. *Hill* a trustee; this has also been given up. The ground now taken is on the contract between the mother and her son.

He denied there was such a contract, and used similar arguments as urged before the chancellor by Mr. *Key.* He cited 1 *Atk.* 12. 1 *Vez.* 279.

*Martin,* (Attorney General,) on the same side, went into an examination of the whole case, and contended there was no contract at all prior to 1777, and none in 1777, which the court ought to enforce. That no parol agreement is ever decreed where it is denied by the party, unless it is clearly proved, and by a partial execution taken out of the statute of frauds. That this case is like all others, if proved it must be enforced, but if not proved, it cannot be enforced. The parties in this case are all children, and all stand in equal degree, putting the valuable consideration out of the question. It is a maxim in equity, that where the equity is on all hands equal, chancery will not interfere. Although her son would have been heir in tail to the land in Prince-George's, yet the mother had absolute power. The advice of her brother to change the land was natural, whether she was to keep it herself or give it to her son. He contended that she never gave the staff out of her own hands, and it was nothing more than a parent's buying land with a view of giving it to a particular child. There was no such agreement as can be enforced. No man can avail himself of a promise made to a third person—*Cro. Eliz.* 369. *Esp.* 106. But if the promise had been made to the son himself, the court would not decree, because it is so unreasonable: she had eight children, and was about to give all her inheritance to one. Suppose the promise to release proved, would it bind either *Drury* or *Abraham?*

As to the evidence and the contract supposed to be made on the 7th of May 1777, and the possession, the amount of it is only this, that the mother permitted her son to work a part of the land, and she worked the other part herself. Her son had no where to go, and she let him live there; and the improvements most likely were made with her money. There is no evidence which shows the transactions of 1777 were in compliance with any former contract; nor does any of the witnesses know any thing of this release, nor do they prove that *Abraham* was to have the land. Although Mrs. *Hill* was not out of her senses when she made her will, yet she was not in a situation

to weigh words. It is proved that she was so ill that she had forgot the whole transaction, and knew nothing of the will until after her son's death; who, it is in proof; on his death-bed begged for a home for his wife. The paper produced as a release does not operate as such; because it was not delivered to Mrs. *Hill;* it is void in law, because it has no parties. To make it a good release, must go into chancery to have it rectified, which chancery would not do, because the land has been since devised. He insists that there are not proper parties before court. The case in 1 *P. Wms.* 60, is not authority, being the case of a brother of the half blood.— 1 *Salk.* 187. If the father has made a provision, however small, the chancellor will interpose and enforce. But as a contract to grandchildren it will not be enforced.

He cited and commented on the following cases: *Fonbl.* 339, 340, 342. 1 *Vern.* 151. *Ca. Temp. Tal.* 239. 1 *Fonbl.* 176, 28, 27, 34, 35, 36, 37. 1 *Powell,* 297.

*Mason,* in reply. The counsel for the appellees profess to consider the case as we do. First, as a voluntary agreement; and secondly, as an agreement upon valuable consideration. And they positively deny any agreement at all. If the court are satisfied that there did exist an agreement between the mother and the son, by which the mother promised to convey, without any other consideration than that of natural love and affection, it is binding upon her, and will be decreed, unless the court are prevented by one of two causes; either by the statute of frauds and perjuries, or because the thing is unreasonable. That the agreement was made by the mother with her son, I prove by the depositions of three witnesses. [He here states the evidence.]

But as to the statute of frauds and perjuries, the attorney-general contends, that no parol agreement will be decreed where it is positively denied, unless it be clearly proved. In answer, I refer to 1 *Powell on Cont.* 295, 296, 297, 298, 299. But there must be a stipulation that the agreement shall be reduced to writing—1 *Vern.* 151. Not so—1 *Fonbl.* 176.

I prove the contract sufficiently certain as to quantity. I prove a partial possession they themselves admit, and that is sufficient. I prove money expended in improvements, that too is sufficient to avoid the statute. But it remains now to consider whether a decree should be withheld because of unreasonableness.

The attorney-general lays it down, that where the persons all stand equal in equity the court of chancery ought

JUNE 1798.

Simmons
vs.
Hill.

JUNE 1798.

Simmons
vs.
Hill.

not to interfere; that in this case they are all children and have equal claims upon the common mother. But the first equity claims the preference—2 *Com. Dig.* 122. But the attorney-general cites *Fonbl.* 342. What evidence is there that these daughters are to be destitute? Can we go out of the record to presume? The mother got a good estate by *Simmons,* and none by *Hill.* Here then, it is contended, we bring the case strongly before the court, as a case proper to be enforced, even though it be considered as one destitute of any consideration but that of natural love and affection.

We come next to consider the contract as standing upon a valuable consideration *bona fide* paid. This too is denied by the appellees' counsel, and here they take two positions in which they think themselves very secure:— *First,* That there is no evidence of an agreement antecedent to May 1777; and *Secondly,* The contract in May 1777 not being in execution of any prior engagement, it is in itself of no effect. I shall *first* consider the transaction as proved to be upon valuable consideration without regard to time. *Secondly,* I shall consider dates to prove the will and release in execution of a prior contract. *Thirdly,* I shall consider the will and release as a substantive independent transaction, proper to be enforced.

As to the *first point*—That it was upon valuable consideration is proved by the declaration of Mrs. *Hill* and of Mr. *Simmons,* the two parties. Concurring in a fact how can they be mistaken? [He here reads the depositions of sundry witnesses.] Without regarding dates, which I shall consider presently as belonging more properly to another part of the subject, I am justified in saying, that a valuable consideration passed from the son to his mother, or was contracted for, provided he had any thing due to him from his father's estate, which the gentlemen, hard of belief, cannot credit. However, let us resort to the papers in the cause. The bill states 934*l.* 15*s.* 6*d.* The answer refers to the inventory which fixes it the same. What do the gentlemen mean by saying there is not a six pence due?

| | | | |
|---|---:|---:|---:|
| The sum due, dollars at 6*s,* was | 934*l.* | 15*s.* | 6*d.* |
| add 25 per cent. | 233 | 8 | 10½ |
| | 1166 | 4 | 4½ |
| The fourth of which is | 292 | 1 | 1 |
| Due in 1745—Came of age in 1765— 20 years interest, | 350 | 9 | 3 |
| Besides sterling debt, this sum due | 642 | 10 | 4 |

But the gentlemen ask how was he maintained? There

is no evidence that his mother did it; at all events she could not overgo the interest. That leaves 292*l*. 1*s*. 1*d*. besides the sterling money.

In adequacy of value is no ground to refuse the fulfilment of a contract—2 *Powell on Cont*. 152—unless accompanied with fraud—2 *Com. Dig.* 125. *Ca. in Ch.* 42. 2 *Vern*, 423. 1 *P. Wms*. 542.

*Secondly,* The release and will considered as done in execution of a prior existing contract. That such a contract was entered into either effectually or ineffectually, (for to the present question it is of no importance which,) is proved by two witnesses, viz. *John Weems* and *Betheredge Simmons.* The first proves it, as having been present when it was made, and the other states it from her mother. It is further proved by another witness, *Thomas Tillard.* He first hints the consideration. But the counsel for the appellees say this was after the year 1777. The witness does not say so. The manner of taking testimony in the country is seldom very accurately done. But take the whole preceding and subsequent sentences together, and it clearly relates to a period much earlier than 1777. It is connected closely with *Charles Drury,* who was probably dead long before; besides, when he comes to speak of the will and release, he states it as an after knowledge gained from Mr. *Magowan.*

But the attorney general has ingeniously proved himself that it was before. He will not criminate Mr. *Magowan;* but Mrs. *Hill* was very sick when this will was written, and though not out of her senses, she was of weak memory, and knew not of this will until after her son's death. Well, but if she never knew of these things until after her son's death, how could she refer to a thing she knew nothing of. Besides, the witness, *(Tillard,)* speaks of a thing executed and not executory. That it was in execution of a prior contract is proved also by Mr. *Magowan's* declarations.

And here let the counsel for the appellees be set right as to a fact which they have strangely misrepresented or misunderstood, and from which misunderstanding much confusion has resulted. Mrs. *Hill* it was who claimed and sought after this will and release in 1777, not her son, or his *friend* Mr. *Magowan,* who by the by is not called the friend of the son in particular by any person but the chancellor and the attorney general. How is this case proved? by every witness who has testified respecting that fact, and by the circumstances of the case. [He reads the depositions of sundry witnesses.]

But again, she had reason to wish it, her son had none; she was like to die, and the land would then descend to her son, and if it did descend, she had nothing in

writing to discharge her personal estate from his claim. This gave her cause to be anxious, and goes a great way to prove it to be in execution of a prior contract. Why it was afterwards given to Mr. *Magowan* shall be explained in proper time. Her after talk about this will is not evidence.

This frees the case of great difficulty; the son while in health never pushed, because he was safe. If his mother died, the land descended to him. The mother too, whilst in health, felt easy in trusting the thing upon parol agreement; when she dreaded death, she wished for something in writing. Her son, like an honest man, gratified her; and in turn when he felt his end approaching, he wished to have something binding in law; but she was old, infirm, and under the guidance of a second brood of children.

We come next to consider this will and release, even supposing it to be the creature of the moment, as a transaction grounded upon a valuable consideration, and proper to be decreed.

The counsel for the appellees contend, that both parties considered this transaction as a thing binding upon neither of them, but in case of the death of Mrs. *Hill*; then

1st. The circumstance of these papers, the will and the release, being put into the possession of Mr. *Magowan,* show they were intended as *escrows.*

2d. The circumstance of a will revocable in its nature and a release not delivered.

3d. Why did Mr. *Magowan* give them up? A breach of trust in him.

As to the *first,* he was their mutual friend, and she might suppose the papers more safe there than in her own house, in the hurry which her death would occasion. She might have no person about her whom she could send to her desk, trunk, &c. But why did they burn this will? That might have explained—Her son might have been an executor.

*Secondly.* The substance and not the form is to be regarded. The substance was to give the land for the money, and that we asked to be enforced. What is a will? until death it is a nullity. A will, in common parlance, implies a last will, words to be taken as they were intended. I shall presently apply some admissions of the attorney-general to this cause. If the court will here reflect that all this was done at the request of Mrs. *Hill,* in execution of a former contract, and her illness, and having put off the thing so long, will well account for the hasty and inartificial manner in which it was done.

*Thirdly.* Had they not burnt the will, that might have shewn the reason. She had a right to change her execu-

tor; to dispose of her personal estate; and it might have been under a pretence of this sort that she sent for the will. Mr. *Magowan* might have confided in her; he might never have dreamt that she would attempt to unhinge a contract she had so earnestly sought after; but he would not send the release. But it has been asked, why surrender the release to *Simmons's* widow? He did not—He delivered it to *Edward Tillard*. Why give it to him? He might intend to move. But why should we encounter these fanciful and imaginary positions, by conjectures however rational, when there is absolute proof in the cause.

That this contract was meant to be conclusive, is proved from Mrs. *Hill's* own declarations. and that of her son, the only two persons on earth interested; [He reads her daughter's *Betheridge Simmons's* deposition;] also by the release itself, which is couched in terms past, and by Mr. *Magowan's* declarations.

The nature of an escrow is to be void, &c. The *onus probandi* upon the person giving; safe keeping will not make an escrow. But this was delivered to Mr. *Magowan* at the joint request of the parties. [He reads sundry depositions to that effect.]

But the counsel for the appellees suppose this was a speculating wavering contract, made by and between an old woman, on the verge of the grave, and her son. It is a strange id a, fit for the partner of an insurance company; a dealer in annuities, or a gamester, but not for an old woman, who could not write her name, and was at the point of death.

The true ground upon which this transaction is to be considered is, that it was an agreement upon valuable consideration to convey land; but an incompetent mode of execution adopted. See *Fonbl.* 34, 35. 36.

But what is a will strictly speaking? What is the meaning in common parlance? And here we will consider an admission of the attorney-general. He admits, if a will had been contracted for upon valuable consideration, as in 1 *Vernon*, 48, the chancellor must have decreed. That under such circumstances the will must be irrevocable; though in compliment to the chancellor, he seems faintly to hint that she was not bound to make new wills.

But, strange as it may seem, the attorney-general denies that there is any proof that Mrs. *Hill* owed the estate of her husband a sixpence. The bill, answer and inventory, the declaration of every witness stating her own acknowledgment, all prove the reverse. Compare this consideration with the case in 1 *Vernon*, 48, does not this shut up the case?

But we are told that this case is not proper to be relieved, for the want of certainty in the subject matter of the contract. I feel myself under some difficulty in speaking to a point so plain in itself. [He reads a number of depositions respecting the agreement and executing a will.] But it is said the contents of the will are not fully proved. If it were not, shall they take advantage from having burnt it? But the contents are fully proved. [He reads the testimony of sundry witnesses upon that subject.] But it is said there is no certainty as to the quantity of the land to be conveyed. Do not the following depositions prove it was the land bought of *Kinsey Johns*? And does not the release itself prove it? [He reads the depositions and the release.] But the release speaks of *two* tracts of land, and she had but one, and one of the counsel, (Mr. *Cooke*,) seems to think this strange; and true it is a strange subterfuge. The bill and answer both state that *Charles Drury* bought 600 acres of land called *Birkhead's Meadows* and *Birkhead's Parcels*; that his sister was to have one half, to wit, 300 acres; which they afterwards speak of as *Birkhead's Parcels*; yet not unlikely that some part of *Birkhead's Meadows* may have been assigned to her, and from motives of caution both are used.—See Mrs. *Hill's* will in favour of the appellees, the same expression is used there.

But it is said the release, so termed, is inoperative in law for the want of parties; and being so, the court of chancery, for the want of proper parties, could not decree, nor can this court. There is a difference between releases which operate by *mittre de droit*, and releases which operate to extinguish.

The contract of a party is to be reasonably construed so as to effectuate the intention; and *id certum est quod certum reddi potest*. The acts of a person are to be more regarded in law than their words. A consideration moving from; a release that could enure to none other; a delivery to that person, taken all together, is good in law. But admit the contrary, it is good in equity and proper to be decreed; nor was the court of chancery without proper parties; nor is this court. The release is proved to be genuine; it was deposited with Mr. *Magowan;* from him it got to *Edward Tillard,* and from him it came to the appellant, who brings it into court; they now have it before them. Can they not decree this paper to be delivered over to Mrs. *Hill's* representatives? What is to prevent them? They have before them the person who has the paper, nay the paper itself; they have before them the persons who ought to have it. What other parties do they want?

I shall not trouble the court about possession. It is

admitted on all hands that the appellant's father possessed part of the land; and it is admitted that he was put into possession by his mother. It is of importance to us of how small a part we were put in possession; a partial execution by delivery of possession is sufficient to take it out of the statute of frauds.—1 *Powell on Cont.* 300, 301, 302. So too I shall not trouble the court to recapitulate the evidence as to improvements; upon that subject see 1 *Powell on Cont.* 295, 296, 297, 298.

THE COURT OF APPEALS, at this term, (June 1798,) *affirmed* the decree of the Court of Chancery.

——❊——

## GENERAL COURT, (E. S.) APRIL TERM, 1799.

### HATCHESON *vs.* TILDEN & BORDLEY.

THIS was a special action on the case. The declaration stated, that the defendants were summoned as judges of the sheriff's election on the first Monday of October 1794. That the plaintiff was a candidate for the sheriff's office, and had the necessary qualifications according to law; that he had a majority of legal votes. Nevertheless the defendants, well knowing the premises, refused to return him as sheriff elect, to the damage of the plaintiff 5000*l.* current money. The general issue of *not guilty* pleaded.

1. It appeared on the trial of the cause, that the plaintiff had 453 votes, *Jones* 443, and *Hall* 270. That the plaintiff received the amount of real and personal property required by the constitution, on the third day of the election, and not before. That the two other candidates had acquired it previous to the election. The defendants made a special return on the 8th of November 1794; but the governor and council refused to receive the return, and sent it back as informal, declaring that the defendants were the sole and exclusive judges of the necessary qualifications. Upon which a second return was made, in which *Jones* and *Hall* were declared duly elected for the office of sheriff of the county of Kent.

*Wright* and *Scott,* for the plaintiff, contended, that although the plaintiff had no real estate, yet if he had personal estate to the amount of 1000*l.* it was a sufficient qualification to make him eligible as sheriff. That the word "and," as expressed in the constitution, "*having real and personal property,*" meant having real *or* personal,

*JUNE 1798.*

Simmons
vs.
Hill.