CHARLES A. WATERS *vs.* CHARLES R. HOWARD AND WIFE, AND OTHERS.—*December,* 1849.

A grandfather, in view of the marriage of his grandson, promised and agreed with the parties, and the mother and friends of the lady, to buy a farm, stock and furnish it, and place his grandson upon it, pay his debts, and give him a start in the world. The marriage was celebrated, and shortly thereafter, the grandfather purchased a farm for about $9,000, and put his grandson and wife in possession thereof, in part stocked it, and soon after died, leaving a will, by which he devised one-third of the residue of his estate, amounting to over $150,000, to his grandson, for life, with remainder to his children, in fee, if any living at his death, and if none, then to his two granddaughters, to whom the remaining two-thirds were devised, with similar limitations. The grandson and wife then filed a bill against the other devisees and executor of the grandfather, alleging that the latter *agreed* to purchase and stock a farm *for complainants,* if the proposed marriage between them should be consummated, and to pay all the debts of his grandson, and furnish adequate means for the support of him and his wife, for the first year after their marriage; that after their marriage, the grandfather, *in part execution of this agreement,* purchased the farm above mentioned, &c., but died without executing a deed to complainants, for the land, or performing the other parts of this agreement, which the bill prays may be specifically executed. Pending this suit, the wife died without issue, and it appearing, from the proof, that the grandfather had the title to the farm conveyed to himself, after the marriage, and while the grandson and his wife were in the possession of it, and that it was his intention to give the possession, only, of the farm, and not the title, to the grandson, whom he wished to reclaim from dissipated and extravagant habits, the chancellor dismissed the bill, and this decree was on appeal affirmed. ·

The circumstances of this case are clearly distinguishable from those of *Dugan, et al., vs. Gittings, et al.,* 3 *Gill,* 138.

Marriage is a good and valuable consideration to sustain a contract. But the contract must be certain in all its particulars; so clear and definite, and so far satisfactorily proved, as to be capable of specific execution.

If it be a parol contract, to take it out of the statute for part performance, the terms must be definite and unequivocal. If uncertain or ambiguous, a specific performance will not be decreed, for the court may enforce what the parties never intended, or contemplated.

If a contract is sufficiently established or admitted, it still remains with a court of equity, as a matter of sound discretion, whether, under the circumstances, they will decree specific performance.

In cases of specific performance, courts of equity may exercise a sound, reasonable discretion, governed by rules and principles as far as may be, yet granting or withholding relief when those rules and principles will

not furnish any exact measure of justice, according to the circumstances of each case, or where the decree, under the circumstances, would be inequitable.

If a marriage contract, containing provisions for children, has been established, and in part executed, and the wife dies without issue, and, by such death, the surviving husband has suffered no injury or prejudice by what has been done towards the promised provision for his wife, equity will not interfere to decree specific execution in his favor.

Where a grandfather made provision for the marriage of his grandson, which he did not fulfil to the letter, but, by his will, made a larger and much more beneficial one, this latter provision is a substitute for the former, and excludes the idea of a double portion to the grandson.

APPEAL from the *Court of Chancery*.

The bill in this case was originally filed on the 2nd of November, 1846, in *Baltimore* county court, as a court of equity, by *Charles A. Waters*, the appellant, and his then wife, *Ann Rebecca Waters*. Pending the suit, she died without issue, and the cause was removed to the court of chancery. *Charles A. Waters* was, therefore, the only complainant at the time of hearing, and is the only party appealing from the decree.

The allegations of the bill and answers, and all the facts and proofs in the case, are fully stated in the opinions of the chancellor, and of this court.

On the 28th of January, 1848, the chancellor (JOHNSON,) passed a decree dismissing the bill, with costs. Accompanying this decree, he delivered the following opinion, a report of which will be also found in 1*st Md. Ch. Decisions*, 112.

"This case, which originated upon a bill filed on the 2nd of November, 1846, on the equity side of *Baltimore* county court, and was afterwards transferred to this court, has been fully argued by the solicitors of the parties, and is now submitted for decision.

"It was filed by the present complainant and his now deceased wife, *Ann Rebecca Waters*, formerly *Ann Rebecca Somerville*, who died on the 29th of January, 1847, without issue, and seeks to enforce the specific performance of what is alleged to have been a contract made with the complainants, prior to their marriage, by *Charles Waters*, the grandfather of *Charles A.*

*Waters*, by which it is charged, that he, the grandfather, agreed that if the then intended marriage should be consummated, he would purchase and fully stock a farm for the complainants, would pay all the debts of the said *Charles*, one of the complainants, existing at the time of his marriage, and would furnish adequate means for their support for the first year thereafter; and that in consequence of these promises and engagements, the marriage was solemnised on the 4th of February, 1846.

"It is charged, that shortly after the marriage, the grandfather, in part execution of his said contract, purchased of *Benjamin Moore*, a farm in *Baltimore* county, of about one hundred and eighty-nine acres of land, and put complainants in possession thereof, and in part stocked the same, and was about to pay the debts of the complainant, *Charles A.*, when he, the grandfather, sickened and died, without executing to the complainants, or either of·them, a deed for the land, or paying the debts, amounting to about $2,000, and without fully supplying the complainants for one year after their marriage.

"That the grandfather, by his will, which the bill exhibits, devised all the residue of his estate to one *Freeborn G. Waters*, and his heirs, in trust, as to one-third of the income for the complainant, *Charles A.*, for life, with remainder to his children, in fee, if there should be any living at the time of his death, and if none such, then the whole to go over to the testator's granddaughters, *Elizabeth A. Howard*, and *Rebecca A. White*, and their children. And the other.two-thirds of the income for the use of the said *Elizabeth A. Howard* and *Rebecca A. White*, respectively, for the life of each of them, with like limitations and restrictions as are contained in the devise, for the use of the said *Charles A.*, the grandson. That the testator's granddaughters have each one child.

"The bill makes the granddaughters, and their husbands, and infant children parties, and *Freeborn G. Waters* the trustee, and prays that they may be compelled to convey the said farm so purchased of *Moore*. That *F. G. Waters*, who is also executor of the will, be compelled to pay the debts due by

the complainant, *Charles A.*, at the period of his marriage, and to perform the other stipulations alleged to have been made by the testator, and for general relief.

"It appears, by the answers of the defendants, and otherwise, that *Charles A. Waters*, the complainant, and *Elizabeth A. Howard* and *Rebecca A. White*, two of the defendants, were brother and sisters, being the children of the late *Dr. Horatio Waters*, and the grandchildren of the testator. And by their answers they insist, that though the farm in question was purchased and stocked, and the complainants, soon after their marriage, put in possession of it, yet it was merely intended to give them the *usufruct*, and not the power of disposing of the property. The habits of the complainant, *Charles*, being expensive and extravagant, and known to be such by his said grandfather, who did not intend to give his said grandson more of his estate than he designed for his said sisters. That he never intended to give the complainants anything beyond the use of the farm and personal property, or to pay his grandson's debts, except upon the condition that his habits were reformed, a condition which has not been complied with.

"That to have transferred to the complainants a title which would have enabled them, or either of them, to part with the property, would have defeated the object of the grandfather, which was to furnish a provision for the grandson and his wife, for its use.

"That the wife of the surviving complainant died on or about the 29th of January, 1847, without issue, and upon that event, the right to require a conveyance of the property, if such right ever existed, (which is denied,) was determined.

"That if any such promise or agreement was made, as is set up in the bill, the provision in the will of the grandfather, for the grandson, his wife, if she should survive him, and his children, must be taken as a full satisfaction; the property so given by the will, being of greater value than that which is claimed under the agreement.

"That the property so claimed was regarded by the testator as forming a part of his estate at the time he made his will, and

34      v.8

was disposed of by that instrument, constituting a portion of that of which the use is devised to the grandson and his two sisters; and that the complainant must elect whether he will hold under the agreement, if any such was made, or under the will; and that having already accepted the provision made for him by the will, he cannot claim under the agreement.   The statute of frauds is also pleaded in one or more of the answers, in bar of the relief prayed.

" The will of *Charles Waters*, the grandfather, executed on the 2nd of April, 1846, and proved on the 14th of May following, after some other devises and bequests, contains the following clause:   ' I do hereby give and bequeath to my friend and relative, *Freeborn G. Waters*, his heirs, executors and administrators, all the residue of my estate, of every kind and description, real, personal and mixed, to be held by him, his heirs, executors and administrators, upon certain trusts.'

" These trusts are, in the first place, to pay certain sums to the testator's wife and son, during their lives; and then ' in trust as to all the residue of his estate, real, personal and mixed, that the said trustee should hold the income, interest, rents and profits of one-third part of the said residue, for the use of his grandson, *Charles Waters*, during his life, the same to be paid to him as they accrue, and after the death of his grandson, if he should leave a child or children, or descendant or descendants of a child or children living at the time of his death, then to hold the said one-third part for the use of such child or children, or descendants, their heirs, executors and administrators, forever, as tenants in common; and if the said grandson should die without issue, living at the time of his death, then to hold the one-half of said third part, and the income, &c., thereof, for the use of the testator's granddaughter, *Elizabeth A. Howard*, and her children, and their heirs, &c., subject to the same limitations, &c., as the one-third part of his estate afterwards devised to her use; and the other half of the said one-third is given, in the same way, to *Rebecca A. White*, the testator's other granddaughter.   One other one-third of the income of his estate to be held by the trustee for the use of the said *Eliza-*

Waters *vs.* Howard, *et al.*—1849.

*beth A. Howard,* as her separate estate, during her life; and after her death, if she leave a child or children, or descendants of such, living at the time of her death, then to hold the same for the use of such child, &c., their heirs, &c., as tenants in common. But if the said granddaughter should die without issue, living at her death, then the third so devised for her use, should be divided between the grandson and the other granddaughter, in the same manner, and subject to like limitations as were expressed with regard to the third of which the income was devised to the grandson. And similar provisions were, in all respects, made with regard to the one-third of which the use was devised to *Rebecca A. White,* the other granddaughter.'

"It appeared, by an agreement signed by the counsel, that the land mentioned in the bill, as having been purchased by the testator from *Benjamin Moore,* was conveyed by him to the testator, on the 17th of February, 1846, and that it contained the quantity of one hundred and eighty-five acres, one rood, and ten perches. It also appeared, by a statement admitted in evidence, that the entire value of the estate of the testator, including the property claimed by the complainants in this case, was nearly $150,000, and that this last mentioned property is valued at $9,000.

"A commission issued, under which a number of letters, written by the testator, were returned, and the depositions of several witnesses taken; but it would be an unnecessary consumption of time, to enter into a minute examination of the proof, it being deemed sufficient, in expressing the views of the court upon the propositions discussed by the counsel, to state the impression which the evidence has made upon my mind.

"The bill, it will be seen, puts the title of the complainants to a decree, upon the ground that the testator agreed, that if they, the complainants, would intermarry with each other, he would purchase and fully stock a farm for them, as their property, and perform the other stipulations alleged to have been entered into on his part; and that in consequence of these promises and engagements, the marriage did take place, and as the consideration of marriage is a valuable consideration, in

contemplation of law, the complainants claim to be purchasers for value.

"These pretensions, on the part of the complainants, are denied by the answers, which insist that no such contract or promise was made by the testator, who designed to give the use, merely, of the property, and not to pass the title, and that such is the fair inference to be put upon his various acts and declarations, oral and written.

"The first question, therefore, is: have the plaintiffs succeeded in proving such an agreement as, upon the principles which govern this court in enforcing the specific execution of contracts, will entitle them to its interposition in this form, considering, for the present, that the agreement itself is, in all its parts, of that description which the court will, when fully proved, direct to be performed?

"This question can, of course, only be determined by a careful examination of the evidence, and after having read it with much attention, I find it, to say the least, very questionable whether the elder *Mr. Waters* did mean to pass to the complainants, or to the surviving complainant, in any event, such a title to the property in controversy, as is sought to be enforced by this bill. Looking to the whole evidence, written and oral, I am strongly inclined to the opinion, that the ground taken by the defence is the true one, and that the purchase of this farm, and the placing the grandson upon it, was intended for the double purpose of giving him the means of earning a present support, and as an experiment by which the grandfather hoped to wean him from his extravagant habits. Any other supposition would subject the grandfather to the imputation of having practised upon his grandson and his wife the grossest imposition.

"If, as the complainants say, they were induced to marry upon the faith of the engagement of old *Mr. Waters*, fully disclosed to give them the title to this farm, and to perform the other stipulations set up in the bill, and he, immediately after the marriage, took the title to himself, he was guilty of a degree of cruelty and deception towards them, wholly inconsistent with

that affection and regard for their welfare which appears upon the face of all his letters, and by the whole evidence. The marriage took place on the 4th of February, 1846, and the deed from *Moore* to the elder *Mr. Waters*, was executed on the 17th of the same month and year. Now, can it readily be believed, that this old gentleman would have entrapped these young people into getting married, by an agreement to make them the owners of this property, and then, in thirteen days from that time, shamefully violate his engagement by taking and keeping the title to himself? Such a supposition is irreconcilable with the nature of his feelings and relations towards them, and, to be credited, must be strongly supported by evidence.

"Much stress has been laid, by the complainant's counsel, upon the case of *Dugan, et al., vs. Gittings, et al.*, decided by the Court of Appeals, at December term, 1845. That case decides, what is believed to have been well settled before, that marriage is a valuable consideration, and that a promise made in consideration of marriage, cannot be revoked at the will of the party who made it. But the evidence in that case, as it appears to me, of the promise, was of a far more conclusive character than in this. Indeed, in that case, there could be no doubt, looking to the declarations and acts of *Mr. Dugan*, both before and subsequent to the marriage, that the property in question belonged to his daughter, *Mrs. Smith*, and her children; and there was not a single act or declaration of his, inconsistent with that view of the case. In this case, as I have already observed, there is much evidence leading to the different conclusions and various considerations of prudence, calculated to deter the grandfather from placing his property at the disposal of his grandson.

"Now this being a case in which the complainants call upon the court to interfere in their favor, by enforcing the specific execution of a contract, they must come before it with a much stronger case than if they were acting defensively, and merely resisting such an application made by the adverse party. Under the circumstances of this case, the court must entertain no rea-

sonable doubt of the existence of the contract, and be satisfied that it is one which, looking to what is just and reasonable, ought to be enforced. 2 *Story's Equity*, sec. 769. *Seymour vs. Delancey*, 6 *John. Ch. Rep.*, 222.

" But there are other grounds upon which, in my opinion, the relief prayed in this case must be refused.

" It is established by the cases, and by writers of the highest distinction, that the specific execution of contracts in equity, is not a matter of absolute right in the party, but of sound discretion in the court. And unless the court is satisfied that the application to it, for this extraordinary assistance, is fair, just and reasonable, in every respect, it will refuse to interfere, but leave the party to his remedy at law, for a compensation in damages. 2 *Story's Equity*, secs. 767, 770. *Corberry vs. Tannehill*, 1 *Har. & John.*, 224. *Seymour vs. Delancey*, 6 *John. Ch. Rep.*, 222.

" Now what is the nature of the application in the present case? and how is the court to afford the redress which is asked from it? The promise charged in the bill, and established by the evidence, if indeed, any promise is shown, was to the surviving complainant, and his late wife, then *Miss Somerville*, and was unquestionably intended, if made at all, to provide for them and their children, if any should be born, a support. But the wife is dead, and there is no issue of the marriage; and the surviving husband now claims to have this contract specifically enforced for his exclusive benefit, although he has received in another form, and by the will of his grandfather, property to a much larger amount. The contract asserted in the bill, it will be observed, is not merely a contract to convey title to a certain parcel of land, but embraces an engagement to stock it, to pay the debts of the grandson, and support him and his family for the first year after their marriage. Now this contract, if enforced at all, as is said in the cases, is to be enforced *ex vigore*, and with unmitigated severity. It must be carried into execution at all its points, though a part of the consideration has unquestionably failed, by the death of the wife, childless; as it is impossible to suppose, if the grandfather ever did make

such a binding engagement as is contended for, that the wife and children were not in his contemplation, and constituted in part, at least the motive for his promise. It seems to me eminently proper, that a case like this should be sent to law, where, in the language of *Chancellor Kent*, in *Seymour* and *Delancy*, 'relief can be afforded in damages, with a moderation agreeable to equity and good conscience, and where the claims and pretensions of each party can be duly attended to, and be admitted to govern the assessment.'

"And in this case, there is a peculiar reason why the power of the court should not be exerted in the form in which it is applied. The contract we have seen, is not confined to real estate, but extends to goods and chattels, and the payment of debts, and it is certainly a general rule, that with regard to contracts, respecting goods and other things of a merely personal nature, this court will not decree a specific performance, except in cases in which a court of law could not give adequate compensation in damages. Unless, therefore, in contracts relating to personal estate, it is clearly shown, that adequate compensation cannot be given by an action at law, chancery will not interfere. 2 *Story, secs.* 716, 717, 718.

"This court then looking to all the circumstances of this case, seeing that in the state of things which now exist it would be impossible to frame a decree, which would do justice as between these parties, being moreover convinced that the leading motive which induced the grandfather to make the promise, if he did make such promise, can no longer operate, I am not disposed to carry this alleged contract into execution; but will leave the party to his remedy at law, where the jury can afford him the relief in damages, which they may, under all the circumstances, think him entitled to.

"If this court should decree the specific performance of this contract, and direct the title to this property, to be conveyed to the complainant, so as to give him dominion over it, I am persuaded I should be doing that which his grandfather never intended, and for which, as I think, there is no sufficient justification in the proof, for not a single witness has spoken of the

nature or quality of the title which the complainant was to receive. And if we are to judge from the will of the grandfather, dated but two months after the marriage, and the charter of the interest which the complainant takes under it, there is the strongest reason for thinking, that the absolute transfer to him, of the title to this property, would be most repugnant to the intentions of the grandfather, then or previously entertained.

" There is, besides, another view fatal to the right of the complainant to a decree.

" The property involved in this case, is estimated at about nine thousand dollars, and the entire estate of the testator, of the income of which the complainant is in the enjoyment of one-third, after the payment of some small annuities, is valued at about $150,000.

" It is contended by the defendant's counsel, that this devise of the income, must be considered as a satisfaction of the contract, if one was made, to convey to the plaintiff the property in dispute in this case; I do not think this position can be maintained upon the authorities applicable to the subject. It is settled, that if the interest which the creditor takes by the will is not *ejusdem generis*, not being co-extensive with, or of the same nature of that to which he is entitled from the testator as his debtor, the legatee will be entitled to both interests. 2 *Rop. on Leg.*, 46, 48.

" But although, in my opinion, the interest which this complainant takes under the will of his grandfather, cannot be regarded as a satisfaction of his claim founded upon the alleged contract, I yet think the will puts him to his election, and that he cannot claim under the will, and under the contract also.

" There can be no doubt that the degree of intention necessary to raising a case of election, must plainly appear upon the face of the will, but then the court is not to disregard what amounts to a moral certainty of the intention of the testator. *McElfresh vs. Schley & Barr*, 2 *Gill*, 181.

" And though evidence dehors the will, will not be admitted to prove or disapprove such intention, there seems to be no valid objection to such evidence to show the state and circum-

stances of the property. *Judd vs. Pratt*, 13 *Ves.*, 168. 2 *Roper on Legacies*, 390.

"Now can there be a doubt that the testator did intend to dispose of this property as his own?

"He took the deed to himself on the 17th February. 1846, and on the 2nd of April following, he made his will, by which he devised to the trustee his whole estate of every kind and description. I throw out of view his declaration to Mr. Poe, which has been excepted to; but I suppose the fact of his taking the deed to himself, is evidence to show the state and circumstances of the property.

"Now is it not morally certain, that the testator intended to dispose, by his will, of this property? and is not that intention apparent upon the face of the will itself, especially when taken in connection with the state and circumstances of the property? He unquestionably had the legal title, and his intention, as it appears to me, might be as well disputed, to dispose of any other part of his estate as this.

"There is another intention also manifest upon the face of this will, which would be frustrated by the success of this attempt on the part of the complainant, and that is, to place the grandchildren on a footing of entire equality. It is perfectly clear that the testator intended to give to each the same precise interest in his estate, in regard alike, to quantity and quality, and to permit this arrangement to be distributed, would be to defeat a cherished object of the testator.

"The rule as asserted by the Court of Appeals in the case of *McElfresh vs. Schley and Barr*, is, "that a man shall not take a benefit under a will, and at the same time defeat the provisions of the instrument," &c., and, as according to my view of this case, the complainant is now attempting by this bill, to violate this rule, I should, on this ground, if none other existed, refuse him relief."

The cause was argued before DORSEY, C. J., CHAMBERS, SPENCE, MAGRUDER, MARTIN, and FRICK, J.

35    V.8

PRATT and NELSON, for the appellants, contended:

1st. That the contract proved by the testimony in the cause, is substantially that set out in the complainants' bill.

2nd. That said contract was founded upon a valuable consideration, was in part performed by the grandfather of the complainant in his lifetime, and that the complainant is entitled to a decree for its specific and complete execution.

3rd. That the death of the wife of the appellant, pending the proceedings, does not impair in any wise his rights under said agreement.

4th. That said contract is not affected by the provisions of the statute of frauds.

5th. That the provisions made for the complainant, by the will of his grandfather is no satisfaction of said contract.

6th. That the complainant, under the circumstances of this case, is not bound to elect, whether he will take under the will of his grandfather, or under the agreement, but that he has a right to take the provision made for him by the one, and to ask a specific execution of the other.

J. M. CAMPBELL and THOMAS S. ALEXANDER, for the appellees, insisted:

1st. That the deceased, *Charles Waters,* never made any such agreement as is alleged in the bill.

2nd. If he did, his will has more than fulfilled it.

3rd. That in any event, as the will carries the property claimed under the agreement; the appellant, taking a benefit under the will, cannot claim against the will under the agreement.

4thly and lastly. That if the agreement were made as alleged, and is yet unperformed, and may be enforced notwithstanding the will, the appellant is entitled to no more since the death of his wife, without issue, than a life estate in *Moore's* farm, and as to the residue of the property mentioned in the agreement, has no remedy in equity.

FRICK, J., delivered the opinion of this court.

The object of the bill filed in this case by the appellant and *Rebecca Ann Waters*, his wife, (since deceased,) is to enforce the performance of a contract alleged to have been made with the complainant, by *Charles Waters* the grandfather of *Charles A. Waters*, in which it is charged: That the grandson, with the sanction and encouragement of his grandfather, having made proposals of marriage to *Miss Somerville*, *Charles Waters*, the grandfather agreed: that if such marriage should be consumated, he would purchase and fully stock a farm for the complainants, would pay all the debts of his grandson outstanding, and would furnish adequate means for the support of him and his wife for the first year thereafter. And this promise and engagement being communicated as well to *Miss Somer-ville* as to her mother and brother, the marriage was afterwards, on the 4th of Feb., 1846, duly solemnized.

It is further alleged, that shortly after the marriage, *Charles Waters*, the grandfather, in part execution of the agreement, purchased a farm in *Baltimore* county, and put the complainant in the possession thereof; and also in part stocked it with furniture, implements and slaves; soon after which he died, before paying complainant's debts, without having executed a deed for the land, and without *fully* stocking the farm, and supplying the means of support for the year ensuing the marriage.

The bill then sets out the will of the grandfather, *Charles Waters*, by which, after a proper provision for his wife for life, he devises all the residue of his estate to *Freeborn G. Waters*, in trust as to one-third of the income thereof, for *Charles A. Waters* for life, with remainder to his children in fee, if any living at his death; and if none, then to his two granddaughters, *Eliza A.*, the wife of *Charles Howard*, and *Rebecca A.*, the wife of *Charles White*, and their children. And as to the remaining two-thirds, the income thereof for the use of these granddaughters respectively for life, with like limitations as contained in the devise to his grandson. Each of the granddaughters had one child. All these parties are made defend-

ants to the bill, and the prayer is, that they may be decreed to convey to the complainants, the farm in question, and that the executor, (who is the trustee also,) be compelled to pay the debts due by the complainant at the time of the marriage, and in all other respects, execute the remaining stipulations of the contract.

The defendants by their answers insist: that although the farm in question was purchased and stocked, and complainants put in possession by the grandfather, yet that the contract to this intent, if any was made, was only to give to the complainants the *usufruct* of the farm and other property, and not the absolute fee.

That the habits of the grandson were unthrifty and extravagant, and so known to the grandfather; and the aid proposed to be given, was only in the hope and upon the condition that he would reform his vicious habits, which he never did. That to have conveyed to him the title in fee, would have enabled the complainant to have defeated the prominent object of the grandfather, in view of the provision he intended for the complainant and his issue; and further, that it was never the design of the grandfather to place the complainant on a better footing with regard to his estate, than his sisters.

The defendants further aver, that only a few days after the marriage, on the 17th day of February, 1846, the property here claimed by the complainants, was, by his own direction, conveyed to the grandfather in his own name, while the complainants were in possession; that it was regarded by him as a part of his estate at the time, and passed under his will as a portion of what was devised in trust for the grandson and his two sisters; and that the provisions thus made for the complainant, *Charles A. Waters,* by the will, is a full performance of any agreement made in contemplation of his marriage.

The will of the grandfather was executed on the 2nd of April, 1846; and it is admitted that the entire estate of the testator, including the property here claimed by complainants, was nearly $150,000; and the property claimed under the

alleged agreement with the complainants, is valued altogether at the sum of $9,000.

The chancellor, upon the whole case presented to him, determined that the complainant had made out no claim for the interposition of a court of equity, and dismissed the bill; and this decision we are called upon to review.

The true inquiry here is, whether the alleged agreement of *Charles Waters*, the grandfather, in consideration of the marriage proposed and consummated between the complainants, is sustained by the evidence in the cause; and how far such an agreement, according to the principles which govern a court of equity in enforcing a specific execution, will entitle the complainant, under all the circumstances, to the interposition which is here sought by him? —

Marriage has always been held in the law to be a good and valuable consideration to sustain a contract. But the contract must be one certain in all its particulars; so clear and definite, and so far satisfactorily proved, as to be capable of specific execution. If it be a parol contract, to take it out of the statute, for part-performance, the terms must be definite and unequivocal. If uncertain or ambiguous, a specific performance will not be decreed. For the court may enforce precisely what the parties never did intend or contemplate. 1 *Story's Eq. Juris.*, secs. 764, 767.

Now what was the intention stamped upon all the evidence in this case?

The grandfather was made aware of the attachment of his grandson to the lady whom he afterwards married. He was before, fully advised of his erratic and extravagant habits. But he approved of the engagement, and as is proved, used every persuasion and inducement to encourage an union between them. He regarded it as the probable means of reclaiming him; and with that view, in all sincerity did make to the parties and their friends, the pledges and declarations which are proved by the witnesses, and also contained in the letters filed in evidence in the cause.

In all the testimony, there is nothing inconsistent or conflict-

ing with the theory, that he intended to buy a farm, to stock it and furnish it, to place him upon it, pay his debts, and give him a start in the world, (as he expressed it;) without designing, at the same time, to invest him with the title in fee, and the uncontroled disposition of an experimental provision, directed to his gradual reform and fixed settlement in life. From the whole tenor of the correspondence, it is obvious, that the grandfather reserved to himself full direction, with regard to the manner in which such provision should be made, and the extent to which it was to go.

He might well, in all the language imputed to him, have looked to a permanent provision for the grandson, and yet have reserved to himself the time at which he would so execute it. He agreed to buy a farm and put him in possession. All this he did, promptly by the day designated. He bought the farm. He gave to Mrs. S., the mother of the lady, the money and means to furnish the house, and partially at least, within the short period intervening before his death, sent the stock and negroes from his own farm.

Can it be supposed that when the chief inducement of the grandfather in making these promises, was to reclaim his grandson, and reform his extravagant habits, that he designed to give him the title and right of control over the property, unconditionally, and thus administer means and encouragement to the prosecution of the very course of life which he desired to check? The object of the grandfather would seem more naturally to correspond with the acts done by him in the execution of that object; to put him *in possession* of a farm, and to stock it, not to pass the title to him. View it as a contract, and to this extent it has been fully performed. And as it appears in evidence, the complainant is still in possession, and competent, under the powers in the will to the trustee, to arrange with him for the continued *usufruct* of the property. The will itself, excludes all idea of title in the complainant over any portion of the property, but gives to him a life estate in a share, estimated at more than $40,000, while the whole estimate of the claim asserted by the bill, is set down at $9,000.

What the grandfather intended and promised, he partly exc-cuted in his lifetime, and afterwards consummated by his will; to settle them on a farm, or in any other *business* pursuit, to provide for them through life, and secure the ultimate benefit of his bounty to their children; keeping it out of the power of complainant to waste his substance, by placing the property under trust for these purposes. The whole disposition of the estate in his will, would seem to correspond with this presum-ed intention of the agreement here set up. He had repeatedly declared his intention to see all his grandchildren settled and provided for in his lifetime. In his will he has preferred none; but has shewn his disposition to be equally favorable to all, by giving to each a full and equal share of his estate. And to decree what is claimed here to the complainant, without see-ing a clear and unequivocal agreement or declaration to give it, would be to disregard the obvious plans of the testator; to make the distribution of his estate unequal, and defeat and dis-appoint all the motives which influenced both the alleged agreement, and the testamentary dispositions of the grandfather.

Such is our view of the motives and inducement to this al-leged contract. And with this key to the conduct of the grandfather, let us glance at the mass of testimony introduced, and see if it can be sustained beyond this, to raise a contract, such as is sought to be enforced by the bill in this case.

To *William T.*, the brother of *Miss Somerville,* he said: "That he would buy them the *first suitable* farm that offered; would furnish it and stock it, and pay their expenses for a year." Not that he *agreed* to do it. And even if he did, the engagement is wholly indefinite and uncertain. Of the first *suitable* farm, who was to judge as to price and quantity of land? And how was it to be stocked, unless with regard to size and value? No intention is here indicated to make a binding contract; but, (as he expressed it on another occasion,) "to do as he pleased, and buy such a place as pleased him-self." In other words, to do what he thought "suitable" for them, and make such provisions as would "give his grand-son a fair start;" and make them, (the husband and wife,)

comfortable, until the conduct of his grandson would justify his "doing more." When he afterwards purchased *Moore's* farm, could he have supposed that he was bound by a legal contract, capable of being enforced against him, and to execute to them a title, which only fourteen days before the marriage, he took to himself? *Hammond,* it is true, (as other witnesses also,) says, that "he wanted to buy a farm for his grandson." But he has no where said that it was in the performance of any agreement or contract to do so. To *Mrs. Somerville,* with whom he corresponded on the subject, and with reference to another farm which was proposed to him for sale, about which he was treating, he writes; *"My view is not to confine my grandson on this spot,* if he turns his attention a to business, as I most ardently hope he will; and then if it be want of judgment, it had much better be on a moderate than a large scale." His anxiety was "to fix his grandson on a farm," as is expressed in a letter to complainant himself; and in his letter to *Wm. T. Somerville,* he expresses the same views, and adds: "I would, without delay, buy a first rate farm for him, as I am anxious to fix *all my grandchildren* in my life time, could I collect what has been long due."

Again, in another letter he says: "I am trying to procure a *suitable* farm on which I could establish you." And how far that which he proposed to do, was definite as to the time, the manner, and the extent of the alleged contract, may be inferred from his language to *Mrs. Somerville;* when expressing to him the fears of complainant, that the grandfather would not fulfill his promises, he said, "that *Charles* had better *trust to his generosity,* as he would do every thing that was right."

There is nothing in all this, or in his other declarations, to show that he ever intended to give the staff out of his own hands, or that the complainant had any right to suppose that he so intended.

Therefore, when he says that he will "buy the first eligible farm," and in another instance, "the most suitable farm," it was always in his view "to settle and fix" his grandson, as he contemplated to fix his other grandchildren; not defining any

particular estate he intended to give, or designating any binding and definite terms upon which he meant to fix them. And further, when he proposed to the father of complainant an exchange, by which he proposed to put complainant on the farm held by the father for years, by possession without title, it indicates, most decidedly, that he designed to give nothing beyond the possession for the time, and as an experiment in the promised reform of the habits of the complainant. That all the grandfather's plans were, at that time, directed to this reform, and their final consummation depended upon it, is further illustrated by his language to the grandson, in the first letter of the series: "You ought," he says, "to have felt assured that all I propose doing for you, would most assuredly be done, and, perhaps, much more, *as I saw you progressing.*"

Upon this brief review of a portion of the testimony, all of which we have carefully examined, (and laying no stress, and, therefore, expressing no opinion on the part excepted to,) we have no difficulty in concluding, that the grandfather never meant or contracted to give to complainant, absolutely and in fee, the uncontrolled disposition of this contemplated advancement. But, standing in *loco parentis* to all his grandchildren, he designed, as they fixed and settled themselves in life, to advance them by a provision suitable to their wants and station, in such manner and at such times as his judgment and "generosity" might dictate.

The true intention in this case, was to make a prospective provision for husband, wife, and children. Here the wife is dead, and there is no issue from the marriage. A prominent part of the motive and consideration on which this promise was based, has failed, and the complainant claims to have the whole performed for his exclusive benefit; although he has received what is admitted to be far beyond the value of the claim, in the precise form in which we conceive the grandfather intended, by his promise, to signify his bounty in his lifetime. He never made an engagement binding on him to the extent claimed by the complainant, and exclusive of any consideration of the wife and of the children, that might result from the marriage.

36    v.8

To provide for these, was among the prominent motives of the grandfather; and the whole complexion of the case is so far changed by the death of the wife, that a strict compliance with what is claimed as the agreement, becomes impracticable. With this motive in view, it is entirely repugnant to it, to assume, even if the wife were still living, that he intended to give such an estate as would embarrass, if not defeat it altogether. That he designed, by his promises, to make, at the proper time, a permanent provision for the complainant, is not doubted. And that he did so, very soon after the marriage, is fully demonstrated by the date and contents of his will, under which the complainant receives *more* than a full equivalent for any engagement or promise which the grandfather ever made to him. The whole case discloses, that he was not an unwilling, but a generous grandfather, anxious for the reformation of his grandson, and with a disposition eminently liberal and kind to complainant, as to all his other grandchildren. He intended to secure to him, and any family he might have, a fair provision, in the event of his becoming settled and fixed in life; and this is as much as he bound himself to do, under any promise that appears upon the testimony. He has liberally done so by his will, and every fair presumption is against the idea, that he ever intended to secure to the complainant a double portion in his estate. For, in his declarations, he uniformly included the other grandchildren with the complainant, in his views and designs of providing for them all, and in his will, he has treated them all as equals, and disposed of his whole estate; and, to enforce this alleged agreement in the form claimed by the complainant, must defeat the manifest intention of the testator, apparent on the face of the will.

The case before us, is clearly to be distinguished from that of *Dugan, et al., vs. Gittings,* 3 *Gill,* 138. There the property, both before and after the marriage, was affirmed by the father to belong absolutely to the daughter and her children. Here the evidence, with all the qualifications with which the grandfather surrounded it, cannot be tortured into an absolute gift in fee. In the case of *Dugan,* the testimony established

the delivery of the house to his daughter, as her own property, prior to the marriage, and that he verbally presented it to her in fee, as a marriage portion. That she continued to reside in it for some time, and after leaving it, was in the enjoyment of the rents and profits (sometimes paid to her by the father himself,) up to the time of his death; *and he made no further provision for her in his will.*

The case there presented, was, therefore, a strong case for the interposition of the court; and, in the exercise of a sound discretion, inherent in a court of equity, they will look to the object and intention to be derived from all the facts and circumstances, and decree equity upon the whole case. It is scarcely necessary to reiterate, that even if a contract is sufficiently established or admitted, it still remains with a court of equity, as matter of sound discretion, whether, under the circumstances, they will decree the specific performance. 4 *H. & McH.*, 252, *Simmons vs. Hill.* 1 *H. & J.*, 224. 2 *H. & J.*, 76. They may exercise a sound, reasonable discretion, governed by rules and principles, as far as may be, yet granting or withholding relief, where these rules and principles will not furnish any exact measure of justice, according to the circumstances of each case, or where the decree, under the circumstances, would be inequitable. 2 *Story's Eq. Juris.*, secs. 742, 769.

Now, here, supposing a contract to be made out. The wife has died since the filing of the bill, and without issue, and the survivor now continues to claim the benefit of a marriage contract, which marriage has ceased to exist, and a provision intended for children, where there are none. If, by the death of the wife, without issue, the complainant has suffered no injury or prejudice by what has been done toward the promised provision for his wife, equity will not interpose. 2 *Freem.*, 35, 36. 3 *Vez.*, 246. See, also, *Baldwin's Rep.*, 489, 490.

And, entertaining the opinions before expressed, with regard to this alleged contract, and its purpose and design, we should do violence to every sound principle of equity and justice, if we consented to enforce it. Looking to all the facts, the original position of the parties, the altered state of things as they

now exist, the impracticability of framing any decree conforming to the original facts and motives that induced the proposed arrangement, and regarding the provisions of the will as more than an equivalent for any obligation to the complainant, by which the grandfather was ever bound, we can find no justification for such a course. Only a short time after the marriage, he executes this will, having previously taken to himself the title, in fee, to *Moore's* farm, then in possession of complainant; and in making his final declaration of intention, says: " I have endeavored, in the foregoing disposition of my property, to do full justice to my family, and to distribute and vest my estate in such manner as would be most likely to ensure a continuance of competence to my descendants, and to guard, as far as possible, against improvidence and mismanagement." This is precisely in the same tone and spirit in which his intention and views were expressed, with regard to the previous provisions for this marriage; and if he has not fulfilled that provision to the letter, he has substituted another much larger and more beneficial, and one that wholly excludes the idea of a double portion to complainant. *Story's Eq. Juris.*, secs. 1106, 1109.

Conceiving, therefore, that to gratify the alleged claim here set up by complainant, would be repugnant to the whole tenor of his grandfather's promises and declarations, in seeking to promote the grandson's reform and advancement in life, we are of opinion, that the decree of the chancellor should be affirmed.

DECREE AFFIRMED.